IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRUCE WOOD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Action No. 11-777-GMS |
| | ) |
| DR. LINDA GALEF-SURDO, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM**

**I. INTRODUCTION**

The plaintiff, Bruce Wood ("Wood"), an inmate at the at the James T. Vaughn Correctional Center ("VCC"), Smyrna, Delaware, proceeds *pro se* and has been granted leave to proceed without prepayment of fees. He filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights. Before the court is a motion for summary judgment filed by the remaining defendants Dr. Linda Galef-Surdo ("Dr. Surdo"), Ihouma Chuks ("Chuks") and Corizon Medical Services, Inc. f/k/a Correctional Medical Servics, Inc. ("CMS") and Wood's opposition thereto, as well as Wood's motion to amend the complaint, opposed by the defendants. (D.I. 92, 100.) For the reasons that follow, the court will grant both motions.

**II. MOTION TO AMEND**

Wood raises medical needs claims against Dr. Surdo, Chuks, and CMS. Upon initial screening, the court dismissed all claims that accrued prior to August 31, 2009 as well as claims against the defendants Perry Phelps, Chris Kline, Michael Meloy, and James Welch. (*See* D.I. 8, 9.)

In the original complaint, Wood complained of numerous medical issues and alleges that he was not provided medical care. Wood has a knee condition that required surgery. The complaint alleges that between July 20, 2009 through July 20, 2011, Dr. Surdo did not order appropriate medical tests, prescribe pain medication, physical therapy, or a cane to aid Wood in walking. Wood also suffers from a skin condition and alleges that Dr. Surdo did not treat the rashes, and she refused to refer Wood to an orthopedist or a dermatologist. (D.I. 3, ¶ IV.1.) Wood alleges that between April 11, 2008 through July 20, 2011, Chuks, a nurse practitioner, refused to treat Wood's knee or his toe nail fungus despite his complaints. (*Id.* at ¶ IV.2.) Finally, Wood alleges that between February 3, 2006 through approximately July 2010, CMS failed to provide him physical therapy following knee surgery, failed to provide follow-up care with the surgeon, and failed to provide pain medication. In addition, CMS denied Wood's requests to see an orthopedist and for physical therapy, pain medication, and a cane. (*Id.* at ¶ IV.3.)

Wood moves to amend the ad damnum clause of the complaint and to remove surplusage from the complaint. (D.I. 100.) The proposed amended complaint makes no real changes to the substance of Wood's claims, but does clarify his request for relief. Therefore, the motion will be granted and the Clerk of Court will be directed to file instanter the amended complaint that is attached to the motion to amend.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the clams in question. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'").

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co.*, 475 U.S. 574; *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-461 (3d Cir. 1989). Pursuant to Rule 56(c)(1), a non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . ." Fed. R. Civ. P. 56(c)(1). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the

burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

The defendants move for summary judgment on the grounds that: (1) the documented medical care received by Wood precludes a finding of deliberate indifference to a serious medical need; and (2) Wood failed to put forth evidence supporting the claim that he had a serious medical condition or that the treatment he received amount to deliberate indifference.

### B. Relevant Facts

The relevant time-frame in this case is August 31, 2009 to September 2, 2011. Dr. Surdo and Nurse Practitioner Chuks worked at the VCC and treated Plaintiff. (D.I. 3, § IV ¶¶ 1-3.) CMS was the contract healthcare provider for the Delaware Department of Correction ("DOC) from July 1, 2005 through July 1, 2010. *See Jackson v. Ivens*, 2012 WL 4498054 (D. Del. Sept. 12, 2012). During the relevant time-frame, Wood presented to medical for a number of ailments including skin rashes, right knee pain, toenail fungus, and feet issues.

#### 1. Skin rash

Wood was seen by medical personnel for issues related to his skin rashes in 2009, on October 14, 23, November 11, 16, and December 10 (D.I. 94, ex. A, 766-67, 836, 848-849, 878, 1169); in 2010, on January 8, 14, February 12, April 13, 15, and September 13 (*id.* at 814-815, 818-819, 830-831, 863, 868-69, 872); and, in 2011, on January 28, March 8, April 1, May 4, June 16, 21, 28, and September 7 (*id.* at 755, 855-57, 860, 1346-49). The skin condition was diagnosed as dermatitis pseudofolliculitis or skin dermatitis. Wood received medication for the skin rashes including Benadryl, Hydrocortisone cream, Selenium Sulfide Shampoo, Polysporin ointment, Clotrimazole cream, Bactrim D, Bacitracin ointment, Tucks pads, A+D ointment, and

Triamcinolone cream. (*Id.* at 755, 764-65, 830-831, 848-849, 855, 863, 868-69, 878, 1349.) It was noted during the December 10, 2009 medical visit that the skin condition was not responding to protocol. (*Id.* at 837.)

Wood's medical and mental health records indicate that he has a tendency to scratch himself when nervous. (*Id.* at 942, 1077-78, 2410-2411.) Medical encourage Wood to practice good skin hygiene. (*Id.* at 856-57, 863, 1347-48.) An April 1, 2011 medical note states that the skin rash lesions were in "some stage of self inflicted trauma," and noted that Wood was seeing mental health for being "unable to control scratching." (*Id.* at 856.) Dr. Surdo diagnosed neuro-dermatitis, encouraged Wood to refrain from touching his skin, and noted, "interestingly the area of his back that cannot be reached, is normal." (*Id.*) As of May 4, 2011, skin lesions were resolving, there were less active lesions, and the skin looked improved. (*Id.* at 855.) On June 28, 2011, Wood provided a history that his rash/skin lesions come and go. (*Id.* at 1347.) He was again diagnosed with neurodermatitis. (*Id.*) The plan was to monitor the condition to determine if the area needed a biopsy. (*Id.*)

Wood filed grievances on April 10, 2010, May 14, 2010, January 21, 2011, and June 21, 2011, seeking treatment for rashes and bumps all over his body, complaining of the medical care received and that the ointments provided did not work, and seeking a referral to a dermatologist. (D.I. 96, ex. C at DOC 32, 56, 101, 146, 150.)

Wood's affidavit indicates that he was sent to a dermatologist in September 2013.[1] (D.I.

---

[1] The court does not consider Wood's affidavit to the extent that it contains legal conclusions. *See Queer v. Westmoreland Cnty.*, 296 F. App'x 290, 294 (3d Cir. 2008) (unpublished) ("Affidavits or deposition testimony setting forth unsupported facts or legal conclusions are insufficient to create a genuine issue of material fact so as to defeat summary judgment."

96, ex. H ¶ 39.) Following a biopsy, Wood was diagnosed with lichen simplex chronicus and prescribed clobetasol cream 0.5% for the skin condition. (D.I. 104, ex. I-5.) As of January 24, 2014, there was no clinical indication to start the medication. (*Id.* at I-20.)

### 2. Right knee

Wood underwent surgery on his right knee in 2006 and has complained of knee pain and his leg giving out since then. (D.I. 96, ex. F; D.I. 97, ex. A.) On January 14, 2010, Wood complained of right knee pain and the knee giving out. (D.I. 94, ex. A, 872.) He was prescribed a knee brace and received it on February 25, 2010. (*Id.* at 765, 1206.) He next complained of knee pain during an April 13, 2010 medical appointment. (*Id.* at 818-819.) Wood was referred to Chuks and was seen by him on April 15, 2010. At the time, there was some bruising on the left thigh which Wood was advised to monitor and report to the infirmary if there were any changes. (*Id.* at 868.) On April 28, 2010, Wood saw his psychiatrist and complained of knee pain. (*Id.* at 1032.) Wood next complained of right knee pain on November 18, 2010 when he as seen by medical.[2] (*Id.* at 862.) The plaintiff was seen for his right knee on January 31, 2011, when Dr. Surdo noted a small effusion (fluid build up) on his right knee. (*Id.* at 859.) Upon examination, Wood had full range of motion and was negative for laxity. (*Id.* at 859, 1176.) Dr. Surdo ordered an x-ray of the knee and the x-ray results were "mild osteoarthritis of the right knee." (*Id.* at 1170, 1172, 1476.)

Dr. Steven Hershey ("Dr. Hershey") performed the arthroscopic partial medial meniscectomy surgery on Wood on June 30, 2006. (D.I. 97, ex. E-6.) He was unsure if physical

---

[2]The medical records do not indicate that Wood complained of right knee pain from April until November 2010. (Id. at 863, 1006-8, 1011, 117, 1023-1024.)

6

therapy was ordered for aftercare, but states that the knee would heal properly even if the medical provider provided no physical therapy for the knee.[3] (D.I. 97, ex. E ¶¶ 3, 8.) He stated that it was not unexpected if the knee had pain and gave out months after the surgery "with [an] old ACL injury." (*Id.* at ¶ 6) Surgery was not performed to repair the ACL tear. (*Id.* at E-6.)

Wood filed grievances on April 15, 2010, May 15, 2010,[4] June 30, 2010,[5] January 21, 2011, February 24, 2011,[6] June 21, 2011,[7] and July 21, 2011, complaining of his knee condition including pain, the knee giving out, that he is waiting for additional surgery and physical therapy, pain medication, a cane, medical sneakers, and a referral to an orthopedic specialist. (D.I. 96, ex. D at DOC 39, 59, 79, 83-84, 98, 107, 109-111, 139, 167.)

Wood's affidavit (D.I. 96, ex. H) indicates that after six months of physical therapy and the use of a steel knee brace, his knee no longer gives out. (*Id.* at ¶ 28.) The affidavit does not indicate when Wood began physical therapy. Medical records indicate that treatment as of

---

[3]Dr. Hershey's answers to discovery express no opinion on the cause of Wood's knee pain.

[4]A November 11, 2010 information resolution for the May 14, 2010 grievance states, "This is an old one that appears to have been overlooked. Please investigate and resolve if possible." (D.I. 96, ex D at DOC 59)

[5]Wood was seen on November 18, 2010 in response to the June 30, 2010 complaint. A treatment plan is noted in Wood's medical record and he was rescheduled for follow-up. (*Id.* at DOC 84.)

[6]In the February 24, 2011 grievance, Wood disputed the results of an x-ray and requested an MRI and an appointment with an orthopedic physician. (D.I. 96, DOC 107.) The grievance resolution at Level 3 indicated that there was no need for an MRI or orthopedic consult. (*Id.* at DOC 111.)

[7]Wood complained that the diagnoses are "wrong." (*Id.* at DOC 139.)

February 2, 2014 included ibuprofen for pain and the use of a knee brace. (D.I. 104, ex. I at I-1, I-2.)

### 3. Toes and Feet

On November 3, 2009, Wood submitted a sick call slip complaining of dry skin on his feet. (D.I. 94, ex. A, 850.) On November 16, 2009, he was seen by medical for dry skin on his feet and given a tube of Tolnaftate cream to apply to his feet two times a day for fourteen days. (*Id.* at 848-849.) Wood presented with diffuse redness of the feet December 10, 2009, and there was no infection upon examination. He was also seen on January 8 and 14, 2010. (*Id.* at 830-31, 836-37, 872.) Wood was again provided Tolnaftate cream and he was prescribed Clotomazole 1% cream. Wood was next seen on March 3, 2011 for dry peeling skin on his feet and for a "thick toenail on his third left and second right toenail." (*Id.* at 858.) He was prescribed "Epsom foot soaks with pumice stone 2x / wk x 4 wks" and given Tolnaftate cream. (*Id.* at 756, 858.) When Wood was seen on September 7, 2011, he asked to see a podiatrist. (*Id.* at 1346.)

Wood filed grievances on April 10, 2010, June 30, 2010, January 21, 2011, April 8, 2011, and July 21, 2011 claiming that he was not provided with the foot care promised, claiming the ointments provided did not work, seeking treatment for his foot condition and nail fungus, and a referral to a podiatrist. (D.I. 96, ex. B at DOC 28, 72, 98, 113; ex. D at 167.) Wood's affidavit indicates that his feet and fungus conditions still exist. (*Id.* at ex. H, ¶ 20.)

### C. Discussion

The defendants move for summary judgment on the grounds that: (1) the documented medical care precludes a finding of deliberate indifference to serious medical needs; and

8

(2) Wood failed to put forth evidence that the medical conditions of which he complains are serious medical needs or that the continued treatment he received was so lacking that it amounts to deliberate indifference. Wood argues that summary judgment is not proper because the evidence demonstrates that he has serious medical conditions of a skin rash, dry red painful feet, toenail fungus, right knee pain and knee giving out and he did not receive adequate medical care or correct diagnoses.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). To prevail under a medical needs theory, an inmate must prove (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *See Estelle v. Gamble*, 429 U.S. at 104. Serious medical needs are those that have been diagnosed by a physician as requiring treatment or are so obvious that a lay person would recognize the necessity for medical attention, and those conditions which, if untreated, would result in a lifelong handicap or permanent loss. *See Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). Deliberate indifference requires more than mere negligence or lack of due care. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To demonstrate deliberate indifference, the plaintiff must demonstrate that the defendant was "subjectively aware of the risk" of harm to the plaintiff. *See Farmer*, 511 U.S. at 828. The plaintiff must allege acts or omissions that are sufficiently harmful to offend "evolving standards of decency." *Estelle v. Gamble*, 429 U.S. at 106.

"Mere medical malpractice cannot give rise to a violation of the Eighth Amendment." *White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990). In addition, an inmate's claims against

members of a prison medical department are not viable under § 1983 where the inmate receives continuing care but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Id.* at 107.

The record reflects that Wood has a several medical conditions including skin rashes, dry red painful feet, toenail fungus, right knee pain and his knee giving out. The record is replete with documentation showing that Wood was provided with ongoing medical care and seen on a regular basis throughout 2009, 2010 and 2011. Wood contends that he should have received physical therapy, but his orthopaedic surgeon physician indicated that the knee would heal properly even without physical therapy. He complains that he requires surgery due to the acts of the defendants, but the record does not support his position. Rather, the record indicates that ACL reconstruction surgery is not indicated, but at some point, Wood will need a knee replacement. (*See* D.I. 104, ex I-2.)

Wood also complains that his skin condition was not properly diagnosed or treated and the condition did not resolve until he was seen by an outside physician. Medical records indicate that during the relevant time-frame, Dr. Surdo diagnosed neurodermatitis, and when Wood was seen by an outside physician in September the diagnosis was lichen simplex chronicus. The diagnoses are the same. Neurodermatitis is also known as lichen simplex chronicus. *See* http://www.mayoclinic.org/diseases-conditions/neurodermatitis/basics/definition/con-20027919. The record further reflects that numerous medications were used to treat the condition. Finally, Wood complains that he did not receive proper treatment for his cracked feet and toenail fungus. Again, the record reflects that Wood received treatment for the conditions.

While Wood did not agree with his treatment, believes that he was not properly diagnosed, and that he should have seen outside medical providers, the record does not support a finding that his constitutional rights were violated. No reasonable jury could find in Wood's favor as the record does not support a finding that the defendants were deliberately indifferent to Wood's medical needs or that they violated Wood's constitutional rights. Instead, the record indicates that steps were taken to see that Wood received constitutionally adequate medical care.

With regard to CMS, in order to establish that it is directly liable for any alleged constitutional violations, Wood "must provide evidence that there was a relevant [] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories).

Because the court has concluded that there was no violation of Wood's constitutional rights under the Eighth Amendment, CMS cannot be liable based on the theory that it established or maintained an unconstitutional policy or custom responsible for violating Wood's rights. *See Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 113 (3d Cir. 2007) (unpublished) (policy makers not liable in prison medical staff's alleged deliberate indifference to prisoner's serious medical needs where, given that there was no underlying violation of prisoner's rights, policy makers did not establish or maintain an unconstitutional policy or custom responsible for violating prisoner's rights). In light of the foregoing, the court will grant the defendants' motion for summary judgment.

11

## IV. CONCLUSION

For the above reasons, the court will grant the plaintiff's motion to amend and will grant the defendants' motion for summary judgment.

An appropriate order will be issued.

UNITED STATES DISTRICT JUDGE

July 15, 2014
Wilmington, Delaware